Lawrence F. WALLACE, Appellant,

v.

UNITED STATES of America,
Appellee.

Thomas J. DONOHUE, Appellant,

v.

UNITED STATES of America,
Appellee.

Benjamin H. BOWIE, Appellant,

v.

UNITED STATES of America,
Appellee.

Nos. 21134–21136.

United States Court of Appeals
District of Columbia Circuit.

Argued June 25, 1968.

Decided May 6, 1969.

Petition for Rehearing Denied July 2, 1969.

Mr. Ira M. Lowe, Washington, D. C., for appellant in No. 21,134.

Mr. Walter E. Gillcrist, Washington, D. C., for appellant in No. 21,135.

Mr. H. Clifford Allder, Washington, D. C., for appellant in No. 21,136.

Mr. William M. Cohen, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., Frank Q. Nebeker and Harold J. Sullivan, Asst. U. S. Attys., were on the brief, for appellee. Mr. Thomas Lumbard, Asst. U. S. Atty., also entered an appearance for appellee in Nos. 21,135 and 21,136.

Before McGOWAN, TAMM and LEVENTHAL, Circuit Judges.

PER CURIAM:

In November, 1965, Robert Earl Barnes, a professional burglar, now serving a substantial sentence in a federal penitentiary, testified before a grand jury that several members of the District of Columbia Metropolitan Police Department had accepted bribes in return for protecting him from arrest and prosecution for plying his trade. Following the return of indictments on April 22, 1966, and an eight-week trial beginning January 5, 1967, appellant police officers were convicted of conspiracy to violate the District of Columbia bribery statute. 18 U.S.C. § 371 (1964); 22 D.C.Code § 704 (1967).[1] Of the numerous trial errors asserted by appellants, only the admissibility of recorded evidence obtained

1. Appellants Wallace and Bowie were also convicted of accepting individual bribes, although Bowie was acquitted on one substantive bribery count. Appellant Donohue was acquitted of bribery. Two other police officers were acquitted of all charges, including a conspiracy count.

through the use of an informer presents issues meriting extended discussion. Having reserved decision on one of these issues pending its resolution by the Supreme Court, we now conclude that the recordings were lawfully obtained and were admissible in evidence, and that none of the other alleged errors denied appellants a fair trial. Accordingly, we affirm their convictions.

### I

The Government monitored and recorded certain face-to-face and telephone conversations between appellants Wallace and Donohue and their acquaintance James Skeens, a sometime gambler who was a party to the Government surveillance. Most of the conversations recorded took place in February, 1966; two occurred early in April of that year.

The Government before trial informed appellants' counsel of the existence of these recordings but obtained a protective order from the trial judge denying appellants' discovery of the recordings because Skeens believed that disclosure of his identity as an informer would imperil the lives of his family and himself. The prosecutor stipulated at an unrecorded pre-trial conference that he did not then intend to use the recordings, and that he would give defense counsel reasonable notice if he later decided to offer them as evidence at the trial. Midway through the trial, after appellant Wallace had completed his testimony on direct and cross, and at the end of the direct examination of appellant Donohue, Skeens changed his mind and agreed to testify for the Government, with the understanding that the Government would provide armed marshals to protect his family. The trial court ruled, over the objections of all three appellants, that Skeens would be permitted to testify in rebuttal and that the recordings could be used as corroboration.

It later developed, however, that due to an inconclusive exchange between counsel and the trial judge with respect to the consequences of Skeens' waiving his attorney-client privilege vis-a-vis his former counsel, who also was trial counsel for appellant Donohue, Skeens did not take the stand, with the tacit acquiescence of all counsel at the trial. Transcripts of the recorded conversations were used to cross-examine Donohue, who admitted participating in the conversations and attempted to explain certain incriminating statements in them by alleging that they were part of the stock-in-trade of an undercover agent. The Government later called the monitoring officer to testify to statements made by Wallace tending to rebut his testimony. It also introduced portions of the transcripts in evidence in connection with the officer's rebuttal testimony. Finally, counsel for Wallace introduced parts of the recordings which tended to exculpate Wallace.

■ Appellants Wallace and Donohue [2] urge that the recordings were inadmissible because they were seized in violation of the Fourth Amendment and the law of the State of Maryland where most of the surveillance took place. Appellants further claim that obtaining recorded admissions through an informer after Barnes had implicated them before the grand jury violated their Sixth Amendment right to counsel. Finally, they allege that the decision to use the recordings after some of them had testified at the trial could not possibly afford them the reasonable notice promised in the pre-trial agreement.

### A. Fourth Amendment Claim

■ Appellants argue that the Supreme Court's ruling in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), should be extended to bar the use at trial of recorded evidence obtained without a warrant, even though one party to the recorded conversation consented to the surveillance.

---

**2.** Appellant Bowie also claims error in the use of the recordings but lacks standing to challenge the manner in which they were obtained. Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (U.S. March 10, 1969).

Courts have divided on this question,[3] but, whatever the reach of the *Katz* decision, it cannot aid these appellants. The Supreme Court has now held that the exclusionary rule adopted in *Katz* shall not be applied to evidence obtained through electronic surveillance conducted before December 18, 1967, the date of the *Katz* decision, and the conversations involved here took place nearly two years before that date. Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (U.S. March 24, 1969), *and see* Kaufer v. United States, 394 U.S. 458, 89 S.Ct. 1223, 22 L.Ed.2d 414 (U.S. April 1, 1969).

### B. CLAIM UNDER MARYLAND LAW

Maryland law proscribes electronic surveillance and wiretapping without prior judicial approval even if one party to the conversation consents. Md.Ann.Code, Art. 27, §§ 125 A–D (1967 Replacement Volume); Art. 35, §§ 92–99 (1965 Replacement Volume). The Government maintains that these prohibitions do not apply to the surveillance in this case, though most of it occurred in Maryland, for two reasons: (1) the Maryland statutes contain exceptions for surveillance conducted by the Federal Bureau of Investigation or by "any other federal investigating agency;" Md.Ann.Code, Art. 27, §§ 125C, 585 (1967 Replacement Volume); Art. 35, § 98 (1965 Replacement Volume), and (2) the evidence is admissible in federal court even if it was obtained *in violation of state law.*

■ We believe that the surveillance in this case was undertaken by a federal investigating agency within the meaning of the statutory exception. The violations of law investigated and prosecuted arose under the federal conspiracy and District of Columbia bribery statutes, both offenses against the United States which are prosecuted in its name. Moreover, the investigation, carried on by Metropolitan Police officers, was conducted under the direct supervision of the office of the United States Attorney. Accordingly, in the absence of a contrary interpretation of the Maryland statute by its own courts, we hold that, for the purposes of this case, the surveillance was conducted by a "federal investigating agency." Because we agree that the surveillance was not forbidden by the Maryland statute under these conditions, we do not reach the question of whether federal courts may freely admit evidence obtained in violation of state law. Cf. United States v. Pardo-Bolland, 348 F.2d 316, 323 (2d Cir.), cert. denied, 382 U.S. 944, 86 S.Ct. 388, 15 L.Ed.2d 353 (1965).

### C. SIXTH AMENDMENT CLAIM

Appellants Wallace and Donohue argue that their statements to Skeens were inadmissible, despite the fact that they had not been arrested, indicted, or otherwise formally charged, because they were obtained without counsel present after the investigation had "focused" upon them. Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); *compare* Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Barnes testified concerning appellants' illegal activity before the grand

---

3. Cases holding that the *Katz* decision applies to so-called consensual surveillance are Doty v. United States (10th Cir., June 4, 1968), petition for rehearing *en banc* granted *sub nom.*, Epps v. United States, No. 9032 (10th Cir., July 29, 1968); United States v. White, 405 F.2d 838 (7th Cir., Jan. 7, 1969) (*en banc*), cert. granted, 394 U.S. 957, 89 S.Ct. 1305, 22 L.Ed.2d 559 (U.S. April 7, 1969); United States v. Jones, 292 F.Supp. 1001 (D. D.C.1968), appeal docketed, No. 22,529 (D.C. Cir. Nov. 29, 1968); *but see* Holt v. United States, 404 F.2d 914 (10th Cir. 1968). Cases holding to the contrary are Dancy v. United States, 390 F.2d 370 (5th Cir. 1968) (electronic monitoring); Dryden v. United States, 391 F.2d 214 (5th Cir. 1968) (telephonic communication); Kaufer v. United States, 406 F.2d 550 (2d Cir. 1968), aff'd, 394 U.S. 458, 89 S.Ct. 1223, 22 L.Ed.2d 414 (U.S. April 1, 1969) (citing Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (U.S. March 24, 1969)).

jury in November, 1965. The monitored conversations used at trial took place in February, 1966; appellants were indicted in April, 1966.

Appellant Donohue stresses the fact that in early December, 1965, the prosecutor invited him to discuss some allegations made against him, but said he would not do so unless Donohue brought with him an attorney or a friend. Donohue engaged counsel who was present at two meetings with the prosecutor, at which the prosecutor sought to obtain a confession from Donohue and his cooperation as a witness.

■ The Sixth Amendment does not forbid the securing of admissions by undercover tactics from a suspect prior to arrest or indictment. No danger of coercion compels police officers and courts to pick a peril-point in an investigation at which the right to counsel attaches to bar further undercover investigation. Law enforcement officers need not, and as a practical matter cannot, be required to halt a criminal investigation when "they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction." Hoffa v. United States, 385 U.S. 293, 310, 87 S.Ct. 408, 417, 17 L.Ed. 2d 374 (1966). The right to counsel has been extended to phases of an investigation prior to arrest or formal charge only when the suspect was in custodial circumstances. Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968); Miranda v. Arizona, 384 U.S. 436, 444 n. 4, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). While it was entirely proper for the prosecutor to advise appellant Donohue to bring counsel to their conferences, the Sixth Amendment did not compel him to elect between efforts to secure Donohue's cooperation, so long as counsel was present when those efforts were made, and further undercover investigation to obtain admissions if those efforts did not succeed.

## D. REASONABLE NOTICE UNDER THE PRE-TRIAL AGREEMENT

■ Appellants claim that the trial court abused its discretion in allowing the use of the Skeens' evidence after appellants Wallace and Donohue had testified in the expectation that it would not be available. The trial court recognized that "reasonable notice" under the agreement was not simply a question of allowing time for defense counsel to digest the transcripts, but one of fairness in admitting the evidence after appellants had taken the stand and committed themselves. The trial judge after inquiry accepted the Government's representations that Skeens had been unavailable up to the time that he changed his mind about testifying, and concluded that the public should not be penalized for the prosecutor's inability to persuade Skeens to testify earlier in its case-in-chief. Without overlooking the importance of appellants' right to discovery and notice, he allowed the testimony in the belief that it was probative, and rejected the argument that appellants were entitled under all circumstances to count on Skeens' continuing unavailability in taking the stand. We think his decision to permit the use of the testimony was well within his discretion, particularly since he limited its use, and incidentally its effectiveness, to the rebuttal of matters raised earlier in the trial.[3a]

---

**3a.** Appellants Wallace and Bowie also argue that the recordings of Donohue's conversations, which were obtained after the informer Barnes had implicated the appellants before the grand jury and the conspiracy was over, contained statements which referred to them in such a way that their impact could not be erased by means of instructions to the jury limiting their application to Donohue, the person who made the statements. Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). *Bruton*, however, is distinguishable. Based as it was on the right to confrontation contained in the Sixth Amendment, see Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), it should not be extended to cover a situation in which the witness involved actually did take the stand and did affirm the fact that he had made the statements at-

## II

■ Of the other issues raised by the appellants, none is meritorious and few require mentioning, much less serious discussion. What follows is a brief review of the more weighty points made by appellants. Appellants Donohue and Bowie moved for a mistrial, and Wallace claimed that he was entitled to severance, when it came out at trial that two witnesses were afraid to testify.[4] These motions were denied after the trial judge admonished the jury not to be influenced by any improper considerations. We find no error in these rulings.

■ Another alleged error involved a newspaper column detailing threats to jurors and to the prosecutor in charge of the case. After this came to the attention of the judge, he interviewed the jurors sparately in chambers in a procedure agreed to by all counsel. The court obtained satisfactory assurances that the jurors could render a verdict not prejudiced by the publicity. *Cf.* United States v. Agueci, 310 F.2d 817 (2d Cir. 1962), cert. denied *sub nom.*, Guippone v. United States, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963). The responses of the jurors on voir dire indicated their commendable efforts to avoid reading comment on the trial. And special verdicts, including acquittal of two defendants on all counts and of two of the appellants on some counts, serve to confirm the court's finding that the jury would be able to render an impartial verdict.

■ A trial involving charges of police corruption, lasting many weeks, most probably cannot be quarantined even with the best efforts of all concerned. However, the prosecution does bear a special responsibility to avoid tactics that needlessly add spice to the atmosphere which inevitably will hang over such trials. We are not impressed by the prosecutor's questioning appellants about connections with criminal characters where the inquiries were never tied up with the incidents charged at trial, nor by what we consider to be a trial needlessly prolonged by a lengthy cataloguing of incidents involving the protagonist, Barnes, which often did not even involve any of the appellants. The prosecutor may have thought that appellants' general acquaintance with the criminal element in the District would help to establish the conspiracy, a doubtful proposition for a group of detectives who can be expected to know who's who in the underworld. In any event, the cumulative potential for prejudice in open-ended questioning outweighed the materiality of the disclosure that appellants were acquainted with a number of local criminals. When it became apparent that these questions were leading nowhere, the trial court cut them short, in time, we think, to prevent undue prejudice to appellants. There may be cases, however, where the court cannot judge the materiality of references to underworld associations until the damage has been done, and thus we emphasize the prosecutor's duty of restraint.

■ Appellants also challenge the sufficiency of the evidence to show knowledge of a conspiracy, claim that they were denied discovery of significant evidence, and assert that they were denied a full cross-examination of Barnes. We find that there was adequate evidence to show mutual knowledge of a common criminal enterprise. No evidence of importance to the defense was withheld, and Barnes was cross-examined for four days, on all but three plainly minor and collateral matters. We thus

tributed to him. Counsel for Wallace and Bowie thus had *every opportunity to* cross-examine Donohue, although their best tactic probably was to accept Donohue's explanations of his statements at face value.

4. In the second incident, another witness replied to an ill-advised question put by counsel for Wallace that Wallace and Donohue had threatened him, but subsequently explained that neither defendant had threatened him directly. Such prejudice as remained after this clarification does not appear to have been so substantial as to warrant our holding that the trial court abused its discretion in denying Donohue a mistrial.

conclude that none of the alleged errors, individually or cumulatively, tainted appellants' trial, and affirm their convictions.

Affirmed.